UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID MOWREY, ADMINISTRATOR OF THE ESTATE OF MATTHEW W. MOWREY,<br>    *Plaintiff*,<br>    v.<br>TOWN OF WINDHAM, ET AL.,<br>    *Defendants*. | Civil No. 3:18-cv-584 (JBA)<br><br>August 7, 2020 |

**RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This indemnification cross-claim arises from a settlement agreement resolving the Estate of Matthew Mowrey's wrongful death claims against two sets of Co-Defendants, the Town of Windham and the Willimantic Switchboard Fire Chiefs Association.

Cross-Claim Plaintiffs, the Town of Windham and its affiliated police department and officers (collectively, the "Town"), now seek to recover its settlement payment and related attorneys' fees from the Cross-Claim Defendants, the Willimantic Switchboard Fire Chiefs Association and its dispatchers (collectively, the "Association"), pursuant to a contractual agreement between these parties.[1] The cross-claim litigants each have moved for summary judgment, with the Town contending that the contract's indemnification clause covers the Mowrey Estate's claims, and the Association asserting the opposite.

---

[1] Specifically, this indemnification cross-claim is brought by the Town of Windham, the Willimantic Police Department, and officers Robert Rosado, Robert Buckner, Elvin Salas, Joshua Clark, James Salvatore and Matthew Edwards. The Willimantic Switchboard Fire Chiefs Association and dispatchers Evan Souza and Michael Rohan are named as Cross-Claim Defendants.

For the reasons that follow, the Town of Windham's Motion for Summary Judgment, ([Doc. # 39]), is granted, and the Association's companion Motion, ([Doc. # 38]), is denied.

## I. Background

### A. The Parties

The Town of Windham encompasses within its geographical limits the former city and borough of Willimantic, Conn. (Town's Cross-cl. Against Ass'n [Doc. # 24] ¶ 1.) The Willimantic Police Department is located in the Town of Windham Public Safety Complex at 22 Meadow Street, Willimantic, Conn. (Joint Stip. of Facts [Doc. # 38-6] ¶ 5.)

The Willimantic Switchboard Fire Chiefs Association is a provider of 911 emergency dispatch services for the Town, which includes the Willimantic Police Department. (*Id.* ¶ 2.) The Association was provided a room at the Public Safety Complex to conduct dispatch and closed-circuit TV monitoring services pursuant to the Agreement. (*Id.* ¶ 6.)

### B. The Agreement

On or about May 15, 2015, the Town entered into an agreement for dispatch services with the Association. (*See* Ex. A (Agreement) to Joint Stip. [Doc. # 38-6].) The Agreement provides that the Association would "monitor the closed-circuit TV covering the entire public safety building, including monitoring prisoners in jail cells and holding area[s]" at all times. (Agreement § 3f.) The indemnification clause in the Agreement provides:

> The Association agrees to indemnify, defend and hold the Town harmless against all claims, demands, suits, liabilities, losses, damages or injuries which may be made or suffered by any person or entity and that arise out of the Association's performance of this Agreement.

(*Id.* § 12.)

### C. The Town's Arrest, Booking, and Jailing of Mr. Mowrey

On August 24, 2016, the Willimantic Police Department received a complaint of a domestic dispute and officers were dispatched to the apartment of Matthew Mowrey and Lynn Provencher. (Am. Compl. [Doc. # 15] ¶ 2.) When the officers arrived, Mr. Mowrey "appeared to be under the influence of drugs or alcohol." (Ass'n's L.R. Stmt. [Doc. # 38-2] ¶ 5.) The officers then placed Mr. Mowrey under arrest, took him into custody, and then transported him to Police Department Headquarters at the Public Safety Complex. (Joint Stip. ¶¶ 11, 12.)[2]

At approximately 11:30 p.m., Cpl. Clark, who had four-to-six months of training in assessing risk of suicide in prisoners, performed the booking and processing of Mr. Mowrey. (Ass'n's L.R. Stmt ¶¶ 8, 10.)

At 12:15 a.m., after placing Mr. Mowrey in a Willimantic Police Department jail cell, Cpl. Clark filled out the prisoner behavior report on Mr. Mowrey. (*Id.* ¶¶ 11, 12.) In the section on suicide risk factors, Cpl. Clark responded in the affirmative to only one question, marking that Mr. Mowrey "appeared to be under the influence of alcohol and/or drugs." (*Id.*) He selected "no" to questions such as, "Has a third party with knowledge of the prisoner informed you . . . that the prisoner is potentially suicidal . . .?" and "Has the prisoner made any comments . . . or engaged in any behavior that would be cause for concern?" (Ex. A (Prisoner Behavior Report) to Ass'n's L.R. Stmt. [Doc. # 38-3] at 1.)

---

[2] Ms. Provencher has testified that during this arrest, she told arresting officer Cpl. Joshua Clark that Mr. Mowrey had asked for a rope earlier in the evening and that the only thought that came to her mind was that Mr. Mowrey wanted to commit suicide. (Ass'n's L.R. Stmt ¶ 3.) Cpl. Clark, however, denied in his deposition that Ms. Provencher mentioned to him that Mr. Mowrey had been asking for a rope. (*Id.* ¶ 4.)

3

### D. The Association's Video Monitoring of Mr. Mowrey's Jail Cell

Two dispatchers for the Association, Evan Souza and Michael Rohan, were on duty during the duration of Mr. Mowrey's detention in the Willimantic Police Department jail cell. (Joint Stip. ¶ 7.) Mr. Souza was performing dispatch services for the police, and Mr. Rohan was performing dispatch for fire services. (*Id.*) Each was provided with a large flat screen monitor, and when a prisoner was placed into a jail cell, the monitors would display the video feed of the prisoner's cell. (*Id.* ¶ 10.)

Mr. Souza and Mr. Rohan understood that if dispatchers were told that a detainee was suicidal, then the detainee was to be "big screened" by the dispatchers. (Ass'n's L.R. Stmt. ¶ 14.) The term "big screened" means that the display of the jail cell was maximized, allowing the dispatcher to see most of the cell. (*Id.* ¶¶ 16, 17.)

Mr. Souza does not remember "big screening" any detainees on the night of August 24, 2016. (*Id.* ¶ 19.)[3] Mr. Souza has also admitted that there "were times in the evening when Mowrey was detained that Souza had the sound off because, even on a low volume, there was a humming which interfered with hearing the radios and the 911 calls when a prisoner was being disruptive." (*Id.* ¶ 21.) He had been aware of this sound problem with the equipment prior to August 24, 2016, but never complained about it. (Souza Dep. [Doc. # 46] at 42.) In his deposition, Mr. Souza also recalled that "[t]here was a time that evening when he heard Mowrey but could not understand

---

[3] In his deposition, Mr. Souza testified that he believed that police officers were required to perform checks every thirty minutes for prisoners in the cellblock, as provided in Windham Police Procedure 2017.15. (Ass'n's L.R. Stmt. ¶ 30.) However, Willimantic Police Chief Robert Rosado testified that the provision was no longer in force or effect on August 24, 2016, having been superseded by the establishment of monitoring prisoners' jail cells by dispatchers employed by the Association. (*See* Ex. A (Rosado Dep.) to Town's L.R. Stmt. [Doc. # 42-1] at 25-28.).

4

what he was yelling because the echo distorted the sound." (Ass'n's L.R. Stmt. ¶ 24.) However, Mr. Souza did "not remember hearing Mowrey say anything about having a medical problem or being suicidal and concluded that he must have had the sound turned off." (*Id.* ¶ 23.)

At approximately 3:00 a.m. on August 25, 2016, Mr. Mowrey was discovered dead in his jail cell, hanging by his socks. (*Id.* ¶ 14.)

### E.  Procedural History

On November 29, 2017, Mr. Mowrey's Estate initiated an action in Connecticut Superior Court, asserting negligence and recklessness claims against the Town of Windham, the Willimantic Police Department, the Association, and the individual officers and dispatchers on duty at the time of Mr. Mowrey's death. (Not. of Removal [Doc. # 1].) On April 6, 2018, this action was removed to the United States District Court for the District of Connecticut on the basis of a federal claim brought under 28 U.S.C. § 1983. (*Id.*)

On August 22, 2018, the Town filed a cross-claim against the Association, seeking complete contractual indemnification for the compensatory damages, attorneys' fees, and litigation costs incurred in the resolution of the Mowrey Estate's claims against them. (*See* Town's Cross-cl. Against Ass'n.) The Mowrey Estate then entered into settlement negotiations with the Town and the Association, with the Town offering to pay $750,000 in compensatory damages and the Association offering to pay $600,000. (Joint Stip. ¶¶ 17–19.) The Mowrey Estate accepted the collective offer of $1,350,000, (*id.* ¶ 20), and the Court entered an order of dismissal on report of settlement as to the Mowrey Estate's claims on October 18, 2019. ([Doc. # 32].)

The case remains active as to the Town's indemnification cross-claim. (Joint Stip. ¶ 21.) On April 13, 2020, the Association moved for summary judgment on the Town's cross-claim, contending that indemnification of the Town is not required as a matter of law. ([Doc. # 38].) The

Town cross-moved for summary judgment on April 14, 2020, asserting that indemnification is required here and that it is entitled to recovery of its $750,000 settlement payment and related attorneys' fees. ([Doc. # 39].)[4]

For purposes of these cross-motions for summary judgment, the cross-claim litigants have stipulated that "a jury reasonably could have found that the Town of Windham Defendants were negligent during the arrest, booking process and jailing of Matthew Mowrey, and that said negligence was a substantial factor resulting in his death." (Joint Stip. ¶ 23.) Likewise, the cross-claim litigants have also stipulated that "a jury reasonably could have found that the Association was negligent in monitoring the video feed from the closed circuit TV camera located in Matthew Mowrey's jail cell, and that said negligence was a substantial factor resulting in his death." (*Id.* ¶ 24.)

## II. Discussion

### A. Legal Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When there are cross-motions for summary judgment, courts must evaluate each party's motion separately, drawing all reasonable inferences against the party whose motion is under consideration. *See Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993); *Aruba Hotel Enterprises N.V. v. Belfonti*, 611 F. Supp. 2d 203, 208 (D. Conn. 2009).

---

[4] The Town's legal fees were paid in equal proportion by the Town's insurers and the Association over the course of the Mowrey Estate's litigation. (Joint Stip. ¶ 22.)

## B. Indemnification Claim

The Town and the Association disagree as to whether the indemnification clause encompasses the Town's negligence in this matter. The Agreement's indemnification clause provides:

> The Association agrees to indemnify, defend and hold the Town harmless against all claims, demands, suits, liabilities, losses, damages or injuries which may be made or suffered by any person or entity and that arise out of the Association's performance of this Agreement.

(*Id.* § 12.)

Under Connecticut law, "contractual indemnification claims that are based on written agreements are construed in accordance with the principles of contract law." *Szymanska v. Univ. of CT Health Ctr.*, No. HHDCV146048550S, 2017 WL 4080438, at *4 (Conn. Super. Ct. July 27, 2017) (internal quotation marks omitted). Accordingly, indemnity agreements "will be construed to cover such losses which appear to have been intended by the parties." *Leonard Concrete Pipe Co. v. C.W. Blakeslee & Sons, Inc.*, 178 Conn. 594, 599 (1979). The intent of the parties should be ascertained according to the written words' "common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Poole v. City of Waterbury*, 266 Conn. 68, 88 (2003).

Connecticut courts have "recognized the enforceability of exculpatory provisions releasing a defendant from liability for its own negligence" where the parties to the agreement are each sophisticated parties in a business relationship. *Dow–Westbrook, Inc. v. Candlewood Equine Practice, LLC*, 119 Conn. App. 703, 711–18 (2010) (discussing indemnification clause agreed upon by two commercial entities). When considering indemnification clauses similar to the one presented in this case, Connecticut courts have explained that they may not read exceptions into

the term "all," and that indemnification clauses that use such broad language may cover the negligence of other parties. *See Laudano v. Gen. Motors Corp.*, 34 Conn. Supp. 684, 688 (Super Ct., App. Session 1977) (holding that "all" "includes a promise to indemnify even the negligent indemnitee"); *see also Cirrito v. Turner Const. Co.*, 189 Conn. 701, 709 (1983) (holding that "all" is as broad a term there is and has no exceptions); *Burkle v. Car & Truck Leasing Co.*, 1 Conn. App. 54, 57–58 (1983) (holding that "any and all" includes a promise to indemnify a negligent indemnitee); *Szymanska*, 2017 WL 4080438, at *4–5 (same).

Relying on *Laudano* and its progeny, the Town contends that the Mowrey Estate's claims against it necessarily arose out of the Association's performance of the Agreement because the Association's stipulated negligence substantially contributed to Mr. Mowrey's death. (Town's Mem. Supp. Summ. J. [Doc. # 39-1] at 16.) The Town asserts that "aris[ing] out of" is a broad condition, as an injury is said to arise out of an occurrence so long as it was "connected with, had its origins in, grew out of, flowed from, or was incident to" that occurrence or otherwise was a "substantial factor" leading to the occurrence. (Town's Mem. at 16 (quoting *Royal Indem. Co. v. Terra Firma, Inc.*, 50 Conn. Supp. 563, 574 (Super. Ct. 2006), *aff'd*, 287 Conn. 183 (2008)).) The Town further asserts that the Mowrey Estate's wrongful death claim arose out of the Association's performance of the Agreement because Mr. Mowrey took his life while the Association was under the contractual obligation to monitor "the closed circuit TV covering the entire public safety building, including monitoring prisoners in jail cells and holding area," (Town's Opp. to Ass'n's Mot. Summ. J. [Doc # 41] at 5 (citing Agreement § 3f)), and, as stipulated, a reasonable jury could find that the Association was negligent in the performance of this monitoring and that this negligence was a substantial factor resulting in his death, (Town Mem. at 7; *see* Joint Stip. ¶ 24).

8

The Association takes the opposite view and argues that because the Town's liability to the Mowrey Estate did not arise out of its performance of the Agreement, indemnification is not required. (Ass'n's Mem. Supp. Mot. for Summ. J. [Doc. # 38-1] at 7.) The Association argues that the Town "stipulated that a jury could find that [its own] actions in arresting and booking Mowrey were negligent and a proximate cause of his death," (Ass'n's Mem. at 7; *see* Joint Stip. ¶ 23), and that the "overarching theory of liability against the [Town] concerned the procedures and actions involved in the arrest, booking, and processing of Mowrey, not the monitoring of Mowrey after he had been jailed," (Ass'n's Opp. to Town's Mot. Summ. J. [Doc # 40] at 2). The Association, therefore, contends that the Town is liable as a result of its own negligence in failing to identify and alert the dispatchers of Mr. Mowrey's suicide risk, which "chronologically preceded" the Association's performance of the Agreement. (*See* Ass'n's Mem. at 17-18.) The Association thus argues that any negligence that occurred during this jailing did not arise out of the Association's performance of the Agreement and consequently falls outside of the scope of the indemnification clause. (*See id.*)

The Court agrees with the Town that the Mowrey Estate's suit arose out of the Association's performance of the Agreement and thus the indemnification clause is triggered. As the Town notes, Connecticut courts have interpreted the language "arising out of" in a broad manner when presented with substantially similar indemnification clauses, requiring only that there be some causal relationship between the Association's performance of the Agreement and the Mowrey Estate's claims. *See Henderson v. Bismark Constr. Co., Inc.*, No. FBTCV176062488S, 2019 WL 3546481, at *2–3 (Conn. Super. Ct. July 10, 2019) (discussing how "arising out of" has been interpreted broadly by Connecticut courts). For example, in *Laudano*, the court required indemnification where the plaintiff had fallen off a ladder due to the indemnitee's negligence. *See*

9

34 Conn. Supp. at 685-86. Confronted with an indemnification clause that required the claim or injury to "grow out of the performance of the contract by [the indemnitor]," the *Laudano* court held that the plaintiff's injury grew out of the indemnitor's performance because the plaintiff "was injured while he was engaged in duties in connection with work to be performed under the contract." *Id.* at 689. Similarly, in *Cirrito*, the court held that the plaintiff's injury "'ar[o]s[e] out of or occur[ed] in connection with the execution of the Work,'" 189 Conn. at 704, because there was a "sufficient connection between his injuries and his work," as the work to be performed under the contract was the plastering of a building, and the plaintiff was injured when he fell down the stairs while leaving the construction site, *id.* at 709.

Here, Mr. Mowrey's injuries arose out of the performance of the Agreement because Mr. Mowrey took his life while the Association was under the contractual obligation to monitor "the closed circuit TV covering the entire public safety building, including monitoring prisoners in jail cells and holding area." (Town's Opp. at 5; *see* Agreement § 3(f).) As the parties stipulated, a jury reasonably could find that the Association's negligence was a "substantial factor" resulting in Mr. Mowrey's death. (Joint Stip. ¶ 24.) And indeed, the Association's dispatcher, Mr. Souza, testified that he heard Mr. Mowrey yelling that evening, that he would turn down the volume "when a prisoner was being disruptive," and that there were other "times in the evening when Mowrey was detained that [he] had the sound off." (Ass'n's L.R. Stmt. ¶¶ 21, 24.)[5] As the Association's negligence was a "substantial factor" resulting in Mr. Mowrey's death, there is necessarily a

---

[5] To the extent that the Association suggests that indemnification is improper because its own negligence flowed from the Town's failure to notify dispatch that Mr. Mowrey was at risk of suicide, the Court notes that the disregard of Mr. Mowrey's yelling and the silencing of the audio feed appear to provide an independent basis for the Association's negligence.

10

"sufficient connection" between the Association's performance of the Agreement and Mr. Mowrey's injuries, which satisfies the indemnification clause's requirement that the claims for which the Town seeks indemnification arise out of the Association's performance. *Cirrito*, 189 Conn. at 709.[6]

As the contract is drafted, it is of no consequence that the Town's own negligence may too have been a substantial factor contributing to Mr. Mowrey's death. As explained in *Patt v. Metropolitan District Commission*, No. X04CV044003558S, 2006 WL 3878083, at *3 (Conn. Super. Ct. Dec. 20, 2006), where "a set of injuries and damages may be caused by more than one substantial factor," indemnification is proper so long as the claims arose out of injuries caused *at least in part* by the indemnitor's performance of the contract. By way of illustration, that court queried:

---

[6] The Association's attempts to distinguish *Laudano* are unavailing. The Association contends that indemnification was ordered in *Laudano* because the plaintiff was injured in connection with the indemnitor's work, so indemnification would have been ordered regardless of whether the indemnitee was negligent. (Ass'n's Reply to Town's Opp. [Doc. # 44] at 2.) The Association argues that *Laudano* stands in contrast to the present case, as the Town's stipulated negligence did not occur in connection with the performance of the Agreement. (*Id.*) However, *Laudano* has nothing to say on whether indemnitee's *negligence* must grow out of the indemnitor's performance of the contract for the purposes of indemnification. *See* 34 Conn. Supp. at 689. *Laudano* stands only for the proposition that a plaintiff's *injuries* had to grow out of the indemnitor's performance of the contract to trigger indemnification clause. *See id.*

The Association's efforts to distinguish *Cirrito* fare no better. The Association maintains that *Cirrito* is inapposite insofar as the indemnitee in that case "had engaged in an activity (the construction and maintenance of the ladder) which was incidental to the work which the indemnitor had contracted to perform." (Ass'n's Opp. at 9.) But contrary to the Association's suggestion that indemnification was ordered because the indemnitee's own negligence occurred in connection with the indemnitor's performance of the contract, *Cirrito* is correctly read as holding that the only requirement to trigger indemnification was that "a causal connection" existed between the work contracted to perform and the injury sustained. 189 Conn. at 708.

11

> [S]uppose that A is a substantial factor in producing P's injuries. B has agreed to indemnify A for damages A has been found liable for, if P's injuries have been caused, in whole or in part, by B's negligence. If negligence of both A and B are substantial factors in producing P's injuries, then B indemnifies A.

*Id.* at *3.[7] Thus, even if the Mowrey Estate's claims also arose from the Town's own negligence, the indemnification clause here has still been triggered by the Association's own actions. Although the Association may now believe this to be an unfair result, it was free to reject such a broad indemnification clause or draft the agreement in a manner that would have shielded it from liability in circumstances involving joint tortfeasors. The Court cannot now read an exclusion into the contract where the parties themselves did not draft one. *See Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999) ("If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself.").

In sum, the Agreement's indemnification clause is triggered by the Association's negligent performance in failing to monitor Mr. Mowrey as he took steps toward committing suicide, which, as stipulated, could be reasonably found to be a "substantial factor" contributing to Mr. Mowrey's death. Accordingly, the Association must hold the Town harmless as to the Mowrey Estate's claims, despite the Town's own stipulated negligence.

---

[7] At oral argument, the Association suggested that the logic of *Patt* was inapplicable to this case, as the indemnification clause there contained language that required the claim to arise out of injuries caused "in whole or in part" by the conduct of the indemnitor. *See Patt*, 2006 WL 3878083, at *3. However, the Court does not find such a difference to be meaningful here, given that the term "all," as used in the Agreement, does not meaningfully differ from "in whole or in part," as used in *Patt*.

### C. Indemnification Award

Having concluded that the indemnification clause applies to the Town's actions in this case, the Court still must determine whether the amount that the Town "paid in settlement was reasonable." *Black v. Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 160 (1996).

Here, the Town paid the Mowrey Estate an amount of $750,000 to settle the claims against it. (Joint Stip. ¶ 19.) The Association, which settled with the Mowrey Estate in the amount of $600,000, does not dispute the reasonableness of the Town's $750,000 settlement, and this amount is in line with damages awarded in similar wrongful death actions. *See, e.g., Ashmore v. Hartford Hosp.*, 331 Conn. 777, 798 (2019) (holding a $1,200,000 award for a wrongful death action was reasonable).

Accordingly, the Association is required to indemnify the Town the amount paid in settlement, in addition to the fees incurred in the defense of the Mowrey Estate's claims which have not already been paid by the Association's insurer.

### III. Conclusion

Accordingly, Cross-Claim Plaintiffs' Motion for Summary Judgment [Doc. # 39] is GRANTED, and Cross-Claim Defendants' Motion for Summary Judgment [Doc. # 38] is DENIED. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 7th day of August 2020.